**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. (Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008) http://www.gaappeals.us/rules/

**July 9, 2012**

# In the Court of Appeals of Georgia

A12A0296. MCMULLEN v. THE STATE.

DILLARD, Judge.

Following a jury trial, Tammi Lynn McMullen was convicted on two counts of homicide by vehicle in the first degree stemming from a motor-vehicle accident in which it was determined that McMullen was driving under the influence of a combination of drugs to the extent that it was less safe for her to do so. Among her ten enumerations of error, McMullen challenges the sufficiency of the evidence to support her conviction, argues that the trial court erred in admitting similar-transaction evidence, and further asserts that the trial court erred for various reasons in denying her motion to suppress blood evidence and in admitting testimony regarding the analysis of that evidence. Although we find that the evidence was sufficient to support her convictions, we are constrained to hold that the admission

of similar-transaction evidence was erroneous. We therefore reverse McMullen's convictions. We note, however, that because the evidence of McMullen's guilt was otherwise sufficient, the State is authorized to retry her without violating the constitutional bar against Double Jeopardy.[1]

Viewed in the light most favorable to the jury's verdict,[2] the evidence presented at trial shows that just before 11:11 a.m. on July 21, 2009, McMullen was driving northbound in the left-hand lane on a roadway which consisted of two northbound lanes, two southbound lanes, and a center-turn lane. Also in the left-hand northbound lane was a stationary truck which had been pulling a two-axle trailer loaded with pine straw. Sometime prior to McMullen's arrival, the trailer became unhitched from the truck, and the victims—the truck's driver and passenger—were attempting to reattach it. Although the flashing lights on the truck were activated, they were not visible from a distance due to the trailer and its contents. McMullen failed to see the truck in front

---

[1] *See Nance v. State*, 274 Ga. 311, 311 (553 SE2d 794) (2001) ("The general rule is that the retrial of the defendant is not barred [when] reversal of the conviction results from trial error rather than evidentiary insufficiency." (punctuation omitted)).

[2] *See Boggs v. State*, 304 Ga. App. 698, 698 (1) (697 SE2d 843) (2010); *see also Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

of her and collided with the rear of the trailer. When she did so, the victims, who had been between the truck and the trailer at the time of the collision, were fatally injured.

A police officer who was in a nearby retail establishment heard the accident and went directly to the scene. He first saw McMullen, who was "shook up" but declined emergency-medical services. Upon discovering the victims and the severity of their injuries, however, the officer immediately called for emergency-response personnel.

The Georgia State Patrol responded to and assumed control of the accident investigation. The first trooper to arrive testified that he spoke to McMullen briefly and inquired into the cause of the accident. McMullen reported to him that she had looked down to set her cruise control and when she looked back up it was too late to avoid striking the trailer. She wanted to seek medical treatment for what was later determined to be a broken collar bone, however, and the trooper offered her an ambulance, which she declined. McMullen instead indicated that she was going to have her husband take her to the hospital, and the trooper allowed her to leave the scene without delay. As McMullen departed in her husband's vehicle, the police

officer who had heard the accident and initially responded was instructed by his supervisor to follow the McMullens to the hospital.[3]

The trooper testified that McMullen was somewhat slow to respond to his questions, which he considered normal for a person involved in a serious accident, but he otherwise noticed no external signs of impairment. He was nonetheless "curious" as to why McMullen failed to see the stationary truck and trailer which, given the circumstances, he found "suspicious." He therefore requested that a State Patrol sergeant meet her at the hospital to obtain additional information about the accident and to request a voluntary blood sample.

When the sergeant arrived at the hospital, McMullen was sitting in a wheelchair in the lobby of the emergency room waiting to be seen. The sergeant first inquired about the accident. McMullen stated that she could not remember much about what happened, but she did recall seeing the truck in front of her and, believing it to be moving forward, "tun[ing] it out," then being unable to avoid the collision

---

[3] Although the police officer did as he was instructed, he was not immediately aware of who was in the vehicle that he had been instructed to follow, and the record contains no evidence as to the supervisor's reasons behind the request. Indeed, the trooper in charge of the investigation did not know that the police officer had been told to follow McMullen, nor is there any evidence that McMullen herself was aware of it.

4

once she realized that it was not moving. The sergeant then asked McMullen if she would voluntarily consent to giving a blood sample, and she agreed to do so.[4] McMullen's consent was witnessed by the police officer who had followed her to the hospital. Her blood was then drawn at 12:40 p.m., and afterwards the sergeant and the police officer left the hospital and had no additional contact with McMullen.

Following the blood draw, McMullen freely left the hospital without receiving treatment. Thereafter, a Georgia State Patrol senior trooper went to McMullen's home at approximately 3:00 p.m. to take a formal recorded statement regarding the accident. The senior trooper left McMullen's home without taking any further action. McMullen later returned to and was treated by the hospital staff for her injuries.

Some months later, law-enforcement officials learned the results of McMullen's blood tests, which indicated the presence of methamphetamine,[5]

---

[4] When asked by the sergeant if she was taking any medication that may show up in the blood testing, McMullen responded that she was on both an anti-inflammatory medication and a thyroid medication, but she made no mention of the other drugs.

[5] Methamphetamine, a Schedule II drug, was present at .18 milligrams per liter, plus or minus 13 percent. *See* OCGA § 16-13-26 (3) (B) (including methamphetamine in the list of Schedule II drugs). Although certain amphetamines can be used for therapeutic purposes, the concentration in McMullen's blood was above any expected therapeutic dosage.

morphine,[6] and phentermine.[7] McMullen was subsequently arrested and charged with two counts of homicide by vehicle in the first degree for driving under the influence of drugs to the extent that it was less safe for her to do so[8] and one count of driving while under the influence of drugs such that she was a less safe driver.[9]

During the ensuing trial, the State presented evidence that the accident occurred on a clear day—free of rain, fog or other visual impairments— and that the immobile truck and trailer were visible from the "straightaway" road for approximately five to seven tenths of a mile prior to the point of impact. The only known eyewitness to the accident testified that she was headed southbound on the same road and observed as McMullen's vehicle approached and then struck the trailer without appearing to brake, slow down, or swerve to avoid the accident in any way.

---

[6] Morphine, also a Schedule II drug, was present at 50 micrograms per liter, plus or minus 16 percent. *See* OCGA § 16-13-26 (1) (A) (xii) (including morphine in the list of Schedule II drugs). The record contained conflicting evidence as to whether this concentration fell within the expected therapeutic range.

[7] Phentermine, a Schedule IV diet drug, was present at 66 micrograms per liter, plus or minus 13 percent. *See* OCGA § 16-13-28 (a) (29) (listing phentermine as a Schedule IV drug). According to the trial testimony, this was within the expected therapeutic range.

[8] *See* OCGA § 40-6-393 (a).

[9] *See* OCGA § 40-6-391 (a) (4).

The witness further stated that there were no other vehicles on the road that would have impeded McMullen's view or prevented her from changing lanes prior to the collision.

The State also presented expert-witness testimony from a clinical neuropsychopharmacologist, who acknowledged that individuals respond differently to different drugs, but nonetheless discussed in general the anticipated effects on the average human body of the drugs discovered in McMullen's blood at the identified concentration levels.[10] He opined that, although the drugs may to some extent offset each other in that the morphine may counter the agitation and excitement caused by the methamphetamine and, to a lesser extent, the phentermine, the combined effect of those drugs would likely negatively impact McMullen's alerting responses,

---

[10] Specifically, the expert testified that methamphetamine, a stimulant, affects the neurotransmitters in the brain that allow nerves to communicate with each other; at the level found in McMullen's blood, it would be expected to increase a person's energy level and cause him or her to be more animated, but also result in him or her focusing on the minutiae and forgetting about the global effects of the surrounding environment, likely impeding one's ability to drive safely. Morphine, an opiate, is a "powerful painkiller" that tends to make a person feel sedated and euphoric, but interferes with his or her ability to focus and/or concentrate; at the level contained in McMullen's blood, it would be "probab[le]" that one's driving ability would be impaired. Phentermine is a less powerful amphetamine-derived substance, which is also a stimulant; alone it would likely not impair one's ability to drive, however it can have an additive effect when combined with other drugs.

7

heighten her level of distractibility, and "certainly increase[ ] the probability of impairment" while driving.

Finally, over McMullen's objection, the State admitted similar-transaction evidence of a 1998 conviction, in which McMullen pleaded guilty to possession of methamphetamine with the intent to distribute.

McMullen testified in her own defense and presented evidence that the source of the morphine in her blood was Avinza, a pain killer that her doctor prescribed for injuries stemming from a prior motor-vehicular accident. She further demonstrated that she was prescribed phentermine for weight control pursuant to a diet program in which she participated. She denied, however, using methamphetamine prior to the accident and suggested that the positive blood reading resulted from her use of a Vick's inhaler the week before.

McMullen also elicited testimony from several witnesses in support of her defense—including her employer (who had worked with her on the morning of the accident), three law-enforcement officials, and another witness who saw her immediately after the accident. Each of these witnesses testified that she exhibited no visible signs of impairment. She called another individual who testified that he had also been driving northbound on the roadway when he came upon the truck and had

8

to swerve to avoid colliding with the trailer after failing to immediately recognize that it was stationary. And finally, McMullen presented an expert witness who called into question the techniques used by the drug laboratory and challenged the test results of McMullen's blood sample.

The jury convicted McMullen on all three counts charged by the State, although the trial court merged the DUI conviction for sentencing purposes. McMullen filed a motion for new trial, which the trial court denied. This appeal follows.

1. McMullen first argues that the evidence was insufficient to sustain her convictions. In support of her position, she points to the conflicts between the results of her blood test and the testimony of several witnesses who stated that she exhibited no physical signs of impairment before or after the time of the accident.

Significantly, however, on appeal from a criminal conviction, we do not engage in a reweighing of the evidence nor do we assess the credibility of the witnesses.[11] Rather, the resolution of conflicts or inconsistencies is a function that falls squarely

_____

[11] *See Boggs*, 304 Ga. App. at 698 (1); *see also Jackson* , 443 U. S. at 319 (III) (B).

within the province of the jury.[12] Instead, we determine only whether there is some competent evidence, even if contradicted, to support each fact necessary to prove the crimes charged.[13] As succinctly stated by the Supreme Court of the United States,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.[14]

Turning specifically to the facts of this case, an individual commits the offense of homicide by vehicle in the first degree by, "without malice aforethought, caus[ing] the death of another person"[15] when "driving while under the influence of any drug

---

[12] *See Boggs*, 304 Ga. App. at 698 (1).

[13] *See id.*

[14] *Jackson*, 443 U. S. at 319 (III) (B) (citation omitted).

[15] OCGA § 40-6-393 ("Any person who, without malice aforethought, causes the death of another person through the violation of . . . [OCGA §] 40-6-391 . . . commits the offense of homicide by vehicle in the first degree . . . .")

10

or the combined influence of any drugs to the extent that it is less safe for the person to drive."[16] A person cannot defend against the crime by showing that he or she is legally entitled to use the drug(s) at issue if the drug(s) has/have rendered him or her incapable of driving safely.[17]

Here, it is undisputed that McMullen was involved in a motor-vehicle accident that resulted in the tragic deaths of two individuals. The State presented evidence that, at the time of the accident, McMullen had controlled substances—methamphetamine, morphine, and phentermine—in her blood.[18] An expert witness testified that the combined effect of the drugs in the concentrations in which they were found would likely impede McMullen's alerting responses, enhance her distractibility, and increase

---

[16] OCGA § 40-6-391 (a) (4) ("A person shall not drive or be in actual physical control of any moving vehicle while . . . [u]nder the combined influence of any two or more [drugs] to the extent that it is less safe for the person to drive . . . .").

[17] *See* OCGA § 40-6-391 (b) ("The fact that any person charged with violating this Code section is or has been legally entitled to use a drug shall not constitute a defense against any charge of violating this Code section; provided, however, that such person shall not be in violation of this Code section unless such person is rendered incapable of driving safely as a result of using a drug other than alcohol which such person is legally entitled to use.").

[18] *See* OCGA § 16-13-26 (1) (A) (xii), (3) (B); OCGA § 16-13-28 (a) (29).

the probability of impairment.[19] And the sole witness to the accident testified that, despite having a clear and unobstructed view of the obstacle in her lane of traffic, McMullen proceeded to collide with the truck and trailer without any sign of braking, slowing, or attempting to avoid the impact. This evidence was sufficient to allow the jury to conclude that the various drugs in McMullen's blood resulted in her being under the combined influence of the drugs to the extent that she was a less safe driver.[20]

---

[19] McMullen correctly points out that three separate law-enforcement officials testified that they observed no external signs that she was impaired. Of the same law-enforcement witnesses, however, the jury was also aware that the first police officer to respond to the scene (after having heard the accident from nearby) had never been trained in the area of sobriety or how to recognize the signs of impairment; the Georgia State Patrol trooper in charge of the investigation spoke to McMullen only briefly as she expressed a need for medical treatment and he otherwise sought to control and manage the fatal scene and resulting traffic, but stated he was still "curious" and "suspicious" enough about the circumstances to ensure that a blood sample was obtained; and the sergeant who met McMullen at the hospital and received her consent for the blood sample never saw her get out of the wheelchair in which she sat.

[20] *See Wright v. State*, 304 Ga. App. 651, 652-53 (1) (697 SE2d 296) (2010) (holding evidence that appellant admitted to taking drugs, lab tests confirming the presence of drugs in his blood, and evidence that his vehicle crossed the center lane and caused a collision was sufficient to establish appellant's impairment); *Howell v. State*, 179 Ga. App. 632, 634 (1) (347 SE2d 358) (1986) ("It is not necessary that the defendant be so under the influence as to be incapable of driving. It is necessary only that [s]he be under the influence to a degree which renders [her] less safe or incapable of driving safely."). *Compare Head v. State*, 303 Ga. App. 475, 476-77 (1) (693 SE2d

2. McMullen next asserts the trial court erred in denying her motion to suppress and allowing the State to introduce, as evidence of a similar transaction or occurrence, a certified copy and testimony regarding her guilty plea, more than *ten years* prior to the present offense, for possession of methamphetamine with the intent to distribute.[21] McMullen moved to exclude the evidence on the basis that the prior crime was not sufficiently similar and was too remote in time to warrant its admission.[22]

In order to preserve a criminal defendant's right to a fair and impartial trial, we have long embraced the "fundamental principle that the general character of an

---

845) (2010) (evidence of a drug in one's system alone, without additional evidence as to the significance of that drug, *i.e.*, whether the quantity indicates recent or past drug use and/or what effect the drug would have on the average person in the context of impairment, is insufficient to sustain DUI less safe conviction).

[21] In her appellate brief, McMullen also attributes error to the admission of a prior conviction for possession of cocaine. At no time during the trial, however, did the State introduce evidence of that prior offense.

[22] The State does not argue, nor did the trial court rely on, any alternative basis to admit evidence of the prior offense. *See* OCGA § 24-2-2 ("The general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct.").

13

accused is inadmissible unless the accused chooses to put his character in issue."[23] Incident to this fundamental principle, we have held that when a defendant is being tried for the commission of a crime, "proof of a distinct, independent, and separate offense is never admissible, unless there is some logical connection between the two, from which it can be said that proof of the one tends to establish the other."[24] This rule recognizes that "[a]n accused is entitled to be tried for the offense charged in the indictment, independently of any other offense not connected with the transaction upon which the indictment was based,"[25] because "evidence of an independent offense or act committed by the accused is highly and inherently prejudicial, raising, as it does, an inference that an accused who acted in a certain manner on one occasion is likely to have acted in the same or in a similar manner on another occasion and thereby putting the accused's character in issue."[26]

---

[23] *Williams v. State*, 261 Ga. 640, 641 (2) (a) (409 SE2d 649) (1991); *see* OCGA § 24-2-2; *Smith v. State*, 232 Ga. App. 290, 291 (1) (501 SE2d 523) (1998).

[24] *Williams*, 261 Ga. at 641 (2) (a) (punctuation omitted); *see* OCGA § 24-2-2.

[25] *Williams*, 261 Ga. at 641 (2) (a) (punctuation omitted); *see Smith*, 232 Ga. App. at 291 (1).

[26] *Williams*, 261 Ga. at 641 (2) (a); *see Smith*, 232 Ga. App. at 291 (1).

To balance these principles, our Supreme Court has held that, before allowing evidence of an independent offense to be introduced, the trial court is to conduct a hearing in which the State must make three affirmative showings: (1) that "the [S]tate seeks to introduce evidence of the independent offense or act, not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general rule of inadmissibility"; (2) that "there is sufficient evidence to establish that the accused committed the independent offense or act"; and (3) that "there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter."[27] And depending upon the reason for which the independent crime is offered, the State may be required to "prove a high degree of similarity between relevant characteristics of the extrinsic offenses and the charged crimes, or it may only have the burden of showing a logical connection between crimes which are essentially dissimilar."[28]

---

[27] *Williams,* 261 Ga. at 642 (2) (b) (footnotes omitted); *see* Uniform Sup. Ct. R. 31.3 (B); *see also Moore v. State*, 290 Ga. 805, 807 (2) (725 SE2d 290) (2012).

[28] *Brockman v. State*, 263 Ga. 637, 640 (3) (436 SE2d 316) (1993) (emphasis omitted).

On review of the trial court's determination to admit similar-transaction evidence, we apply the clearly-erroneous standard to the court's factual findings regarding whether the State satisfied the three-pronged test set forth *supra,* and we will not reverse its decision to admit the conforming evidence absent an abuse of discretion.[29]

Here, McMullen's prior conviction stemmed from an incident in 1997 in which she was the passenger in a vehicle that was stopped by a deputy sheriff conducting a license check. The State called the deputy as a witness, and he testified that the driver of the car was determined to be driving under the influence and gave him consent to search her vehicle. During the search, McMullen was seen trying to swallow an undetermined amount of methamphetamine that had been in her pants, and the deputy found an additional amount of methamphetamine in a small box in the car. The deputy testified that McMullen appeared to be under the influence of methamphetamine and became violent with him and his partner. McMullen ultimately pleaded guilty to possession of methamphetamine with intent to distribute, and the State tendered a certified copy of her conviction.

---

[29] *See Reed v. State*, __ Ga. __, at *3 (3) (Case No. S12A0443, decided April 24, 2012) (Carley, C. J.) (recognizing that the appellate courts have been inconsistent in their application of the standard of review in this context).

16

The trial court determined that the crimes were sufficiently similar so as to allow the evidence of the prior conviction for the limited purpose of showing McMullen's course of conduct, bent of mind, and intent.[30] We are constrained to conclude, however, that the trial court's determination in that regard was clearly erroneous.

Other than the fact that both crimes involved methamphetamine, there are virtually no similarities between the two crimes. And although similarity is not "the only factor, nor is it necessarily the controlling factor" that governs admissibility, the ultimate issue is whether the evidence of other crimes has "relevance to the issues in the trial of the case."[31] Here, we can discern no relevance that a ten-plus year old conviction for possession of methamphetamine with intent to distribute would have

---

[30] Intent, course of conduct, and bent of mind have previously been held to be proper purposes for the admission of similar-transaction evidence. *See Becker v. State*, 280 Ga. App. 97, 98 (2) (633 SE2d 436) (2006) ("A proper purpose for the introduction of the evidence would be to establish motive, intent, plan, identity, bent of mind or course of conduct."); *Hurston v. State*, 278 Ga. App. 472, 475-76 (3) (a) (629 SE2d 18) (2006). We note in passing that the new evidence code adopted by the Georgia General Assembly, effective January 1, 2013, eliminates the bent-of-mind and course-of-conduct exception to similar-transaction character evidence. H. B. 24, 2011-2012 Gen. Assem., Reg. Sess. (Ga).

[31] *Ward v. State*, 262 Ga. 293, 295 (2) (417 SE2d 130) (1992) (punctuation omitted).

17

to the determination of whether McMullen was under the influence of a combination of drugs to the extent that it rendered her a less safe driver during the accident at issue.[32] The only arguably relevant information to be gleaned from the prior offense—and it comes from the circumstances surrounding the incident and not the conviction itself—is that McMullen may have a propensity to ingest methamphetamine, because it appears that she had done so on a prior (albeit remote) occasion.[33] But in the absence of any similarity or logical connection between the two crimes, this is exactly the type of inadmissible character evidence that the safeguards set forth *supra* are designed to protect against.[34] Nor can we say, given the conflicts

---

[32] *See King v. State*, 230 Ga. App. 301, 302-03 (1) (496 SE2d 312) (1998) (holding that proof that a defendant possessed drugs on one occasion does not tend to prove that he was under the influence of drugs on a different, unrelated occasion).

[33] Indeed, the State argues in its brief that "[t]he logical connection [between the two crimes] is that proof of [McMullen's] condition of being under the influence of methamphetamine on the prior occasion does, in fact, show [her] propensity to ingest that illegal substance . . . ."

[34] *See Williams*, 261 Ga. at 641 (2) (a); *see also Guyton v. State*, 272 Ga. 529, 532 (3) (531 SE2d 94) (2000) (recognizing that the admission of evidence "to show bad character or a propensity to commit a certain type of crime" is improper); *Smith*, 232 Ga. App. at 291 ("The primary aim of [the rule prohibiting evidence of a party's conduct in other transactions] is to avoid the forbidden inference of propensity. Just because a defendant has committed wrongful acts in the past is not alone legal grounds to believe he has done so on the occasion under scrutiny.").

in the evidence, that proof of McMullen's impairment in this case was so overwhelming as to render the admission of the prior crime harmless.[35] Thus, because evidence of prior crimes is "highly and inherently prejudicial,"[36] we conclude that the trial court's decision to allow evidence of the prior crime in this case was clearly erroneous.[37] We therefore reverse McMullen's convictions. As previously mentioned, however, the State is authorized to retry McMullen should it choose to do so.[38]

3. Our holding in Division 2, *infra*, renders it unnecessary for us to address McMullen's remaining enumerations of error, which we have determined to be either

---

[35] *Compare Strahan v. State*, 273 Ga. App. 116, 121-22 (2) (614 SE2d 227) (2005) (concluding that appellant's prior burglaries were not similar to his present crime of armed robbery and were thus erroneously admitted, but nonetheless holding the error harmless in light of the overwhelming evidence of appellant's guilt).

[36] *Williams*, 261 Ga. at 641 (2) (b).

[37] *See Walraven v. State*, 250 Ga. 401, 407-08 (4) (b) (297 SE2d 278) (1982) (holding that the admission of appellant's confession to incest amounted to nothing more than improper character evidence in his trial for murder); *King*, 230 Ga. App. at 302-03 (1) (reversing appellant's conviction after concluding that the trial court erroneously admitted evidence of his prior conviction for sale of methamphetamine in his present trial for possession of methamphetamine in his bodily fluids); *see also Usher v. State*, 290 Ga. App. 710, 713 (1) (659 SE2d 920) (2008) (concluding that the erroneous admission of appellant's prior burglary convictions warranted reversal of his present conviction for aggravated assault, burglary, and robbery).

[38] *See Nance*, 274 Ga. at 311.

19

without merit or unlikely to recur on retrial. We nonetheless take the opportunity to address the following two enumerations, which may recur, in order to clarify the current state of our law.

(a) McMullen asserts that the trial court erred in failing to suppress the blood evidence because she was not given her implied-consent warnings[39] prior to the blood being drawn. In support of her argument, McMullen relies on *State v. Morgan*,[40] in which we held that "an officer is not permitted to circumvent the implied consent statute by merely requesting consent without giving any implied consent notice or warning."[41]

The fatal flaw in McMullen's argument, however, is that in 2006, our General Assembly amended the implied-consent statute to expressly provide that "[n]othing in this Code section shall be deemed to preclude the acquisition or admission of evidence of a violation of [Georgia DUI laws] if obtained by voluntary consent . . .

---

[39] *See* OCGA § 40-5-67.1 (b) (2); *see also* OCGA § 40-5-55; OCGA § 40-6-392.

[40] 289 Ga. App. 706 (658 SE2d 237) (2008).

[41] *Id*. at 708.

20

."[42] And, as we have previously acknowledged, this amendment "eliminates the need to give the notice [when] an individual voluntarily agrees to testing."[43] Thus, the trial court did not err in denying McMullen's motion to suppress for failure to give implied-consent warnings.

(b) McMullen contends that the trial court erred in admitting testimony regarding the results of her blood test from the GBI crime laboratory technician who was tendered as an expert in the area of forensic toxicology. She argues that the testimony constituted inadmissible hearsay and violated her Sixth Amendment right

---

[42] OCGA § 40-6-67.1 (d.1); *see* Ga. L. 2006, Act 545, § 2, eff. July 1, 2006. Although *Morgan* was decided after the effective date of subsection (d.1), that case does not acknowledge or address the statutory amendment. *See* 289 Ga. App. 706. But because the opinion also does not indicate the date on which the underlying crime occurred, and we have held that the statutory amendment did not apply retroactively, we need not assume that *Morgan* wrongly failed to consider the effect of the amendment. *See Williams v. State*, 297 Ga. App. 626, 628 (677 SE2d 773) (2009).

[43] *Williams*, 297 Ga. App. at 628; *see also Reeves v. Upson Reg'l Med. Ctr.*, No. A11A2194, 2012 WL 934517, at *3 (2) (Ga. App. March 21, 2012) ("[W]hen we consider the meaning of a statute, we always must presume that the General Assembly means what it says and says what it means, and an unambiguous statute must be afforded its plain meaning" (citation and punctuation omitted))*; In the Interest of L. J.*, 279 Ga. App. 237, 238 (630 SE2d 771) (2006) ("[When] the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly.").

to confrontation because the expert did not actually conduct the tests on McMullen's blood himself.[44]

We agree with McMullen that the law does not generally permit the State to admit an inculpatory forensic laboratory report via the "surrogate testimony" of a scientist who neither participated in, observed, or analyzed a test on a blood sample, but whose opinion instead relies upon the affidavit of a non-testifying laboratory analyst; such testimony violates a defendant's Sixth Amendment right to confront the witness against him or her.[45] This, however, did not happen in the case *sub judice*.

McMullen's blood sample was first subjected to an immunoassay test, which is an initial screening to confirm the presence or absence of drugs, and then it was run through two different types of instrumentation, one called a liquid chromatography-mass spectrometry and the other a gas chromatography-mass spectrometry. Once the blood sample was run through the instrumentation, the machine produced a

---

[44] *See Crawford v. Washington*, 541 U. S. 36, 59 (124 SCt 1354, 158 LE2d 177).

[45] *See Bullcoming v. New Mexico*, __ U. S. __ (II) (B) (131 SCt 2705, 180 LEd2d 610) (2011); *see also Disharoon v. State*, Nos. S11G1880, S11G1881, 2012 WL 1571549, at *2 (Ga. May 7, 2012).

"phonebook"-sized data report from which it was possible to determine the identity and relative concentrations of the drugs contained in the blood sample.

Although the State's expert witness admitted that he did not physically place McMullen's blood sample into the instrumentation and perform the tests himself, he examined and analyzed "every piece of data" that was produced, drew conclusions from that data, and then testified regarding his independent expert opinion derived from that data.[46] The expert further testified that the data report itself contains information regarding calibrations and controls run prior to and after the testing of McMullen's blood from which it was possible for him to confirm both that the instrument was in proper working order and that the tests were performed correctly.

Under these circumstances, the trial court did not err in allowing the testimony of the expert witness even though he did not actually perform the testing procedure himself. It is well established that "an expert may base his opinion on data collected by others" and that his or her "lack of personal knowledge does not mandate the exclusion of the opinion but, rather, presents a jury question as to the weight which

---

[46] The data report itself was not tendered into evidence.

should be assigned the opinion."[47] Moreover, because the expert personally viewed and analyzed the data which formed the basis of the expert opinion about which he testified, he was not acting as a mere "surrogate,"[48] but rather "had a substantial personal connection to the scientific test at issue."[49] It follows then, that the expert witness's testimony did not violate McMullen's Sixth Amendment confrontation right.[50]

---

[47] *Dunn v. State*, 292 Ga. App. 667, 671 (1) (665 SE2d 377) (2008) (punctuation omitted); *see Haywood v. State*, 301 Ga. App. 717, 722 (3) (689 SE2d 82) (2009) ("[W]e have long held that an expert need not testify to the validity of every step that went into the formulation of his results as a foundation for their admissibility and may base his opinion on data collected by others." (punctuation omitted)).

[48] *Compare Bullcoming*, __ U. S. at __ (II) (B).

[49] *Disharoon*, 2012 WL 1571549, at *2.

[50] *See Dunn*, 292 Ga. App. at 669-71 (1) (concluding that "[t]he expert's testimony was proper . . . because the supervisor came to her own independent conclusion" as to the identity of the substance contained in defendant's blood based upon her review of the test results); *Haywood*, 301 Ga. App. at 721-23 (3) (permitting testimony from expert who did not prepare and conduct testing, but who nonetheless reviewed the results and exercised her own expert judgment as to what the blood contained); *Reddick v. State*, 298 Ga. App. 155, 157-58 (2) (679 SE2d 380) (2009) (same); *see also Williams v. Illinois*, 567 U. S. __, (III) (C) (Case No. 10-8505, decided June 18, 2012) (holding that an expert's testimony regarding her conclusion that the defendant's DNA profile matched that of the DNA profile taken from the vaginal swabs of the victim, the testing of which the expert had no role in, did not violate the Confrontation Clause). *Compare Bullcoming*, __ U. S. at __ (II) (B); *Neal*

For the foregoing reasons, we are constrained to reverse McMullen's convictions.

*Judgment reversed. Ellington, C. J., concurs. Phipps, P. J., concurs fully as to Divisions 1, 2, and 3(a), and in judgment only as to 3(b).*

---

*v. Augusta-Richmond County Personnel Bd.*, 304 Ga. App. 115, 118 (1) (695 SE2d 318) (2010) (holding inadmissible the testimony of the medical review officer who merely received the results of a lab test and included them in his report because the witness "could not testify about the accuracy of the test result, and acted as a mere conduit for the non-testifying technician's findings" (punctuation omitted)).