In the Supreme Court of Georgia

Decided: June 16, 2014

S14A0303.  SHERMAN v. THE STATE.

HUNSTEIN, Justice.

Appellant Paul Douglas Sherman was convicted of felony murder, aggravated assault, concealing the death of another, and obstruction of a law enforcement officer in connection with the August 9, 2010 death of Joanne Kent. Sherman appeals the denial of his amended motion for new trial and his conviction and sentence, asserting that his trial counsel rendered ineffective assistance and the evidence was insufficient to support the jury's verdict. Finding no error, we affirm.[1]

_____

[1] In the September term of 2010, a Gwinnett County grand jury indicted Sherman for malice murder, felony murder, aggravated assault, concealing the death of another, and obstructing or hindering a law enforcement officer. During October and November 2012, Sherman was tried before a jury. On November 2, 2012, the jury returned a verdict of guilty on all counts except that for malice murder. On the same day, the court sentenced Sherman to life imprisonment for felony murder, a consecutive ten-year term for concealing the death of another, and a concurrent 12-month term for obstructing or hindering a law enforcement officer. The aggravated assault charge merged with the felony murder charge. Sherman filed a motion for new trial on November 7, 2012, which was amended on July 29, 2013. The trial court held a hearing on Sherman's motion for new trial on August 2, 2013, and denied the motion in an order filed August 5, 2013. Sherman filed a notice of appeal on August 28, 2013. The appeal was docketed to the January 2014 term of this Court and submitted for a decision on the briefs.

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. At approximately 11:00 p.m. on August 9, 2010, Gwinnett County police officers Pauly and Wilcox responded to a suspicious vehicle call in Buford, Georgia. Upon arrival at the scene, Officer Pauly found Sherman seated in the driver's seat of an Oldsmobile, which was parked behind a house with its lights on and the engine running. Upon the officers' questioning, Sherman identified himself. On the ground next to the driver's side of the vehicle, Officer Wilcox located a silver tire pressure gauge with a copper pad inside of it, which the officers recognized as a makeshift pipe commonly used to smoke crack cocaine. Sherman originally denied that the pipe belonged to him but later confessed that it was his pipe. Upon further questioning, Sherman said that he was there to smoke methamphetamine. Sherman did not give consent for the officers to search the vehicle because, as he explained, the car did not belong to him. Officer Pauly decided to handcuff Sherman for safety reasons and to prevent him from running. As Officer Pauly began to place handcuffs on him, Sherman said that he had a cut on his finger. While Officer Pauly looked down at Sherman's finger, Sherman took off running. Officers Wilcox and Pauly chased after Sherman, until Officer Wilcox fell and

2

injured his ankle. Officer Pauly continued chasing Sherman for about 50 feet until he lost sight of Sherman. Upon a search of the vehicle, law enforcement officers discovered the body of Joanne Kent wrapped in a yoga mat in the trunk of the car. Kent had no pulse.

Sherman went to the home of his friend, Ezekiel "Luke" Brown, where he borrowed Brown's phone to call his wife. Meanwhile, Corporal Dennis Hennelly went to Sherman's wife's home and was there when Sherman called his wife. Sherman's wife identified the caller as Sherman. Corporal Hennelly could overhear Sherman speaking on the phone and heard him say something to the effect of "if I get pulled over and I've got a body in the trunk I get life, I don't get to explain it."

Tanya Baker and Teresa Wilson were at Brown's house when Sherman arrived. Baker overheard Sherman talking on the phone, saying that "something really, really bad happened," he would "be gone for a long, long time," and "we were in the car." Wilson overhead Sherman tell Brown the following: "Something really bad has happened. By now they found the body. I thought she stole my pills." Sherman also told Brown that he thought the victim took his pills and that after he killed her, he found the pills. Additionally, Sherman said to

3

Brown that "he had got in a little trouble," the "body was in the trunk," and "he was going to be gone for a long time."

Sherman eventually left Brown's home, slept at another friend's house, and then decided to turn himself in to police. At the time of his arrest, Sherman had visible cuts on his forearms. Sherman's palm prints matched a latent palm print found on the trunk of the car.

The Chief Medical Examiner for Gwinnett County performed an autopsy on Kent and determined that she had died as a direct result of manual strangulation. The medical examiner also noted various abrasions on Kent's face. Forensic testing showed that Sherman's DNA was found under Kent's fingernails.

At trial, Kevin Ingram and Aaron Davis testified that on August 10, 2010, they had seen an Oldsmobile parked at a dump site in the Buford area. They testified further that Sherman approached them while they were at the dump site and stated that he was "back there getting scrap metal and getting oral sex from some girl, him and some other dudes." Ingram and Davis only saw Sherman at the dump site, and when they left, Sherman remained there.

Sherman also testified at trial. Although Sherman denied killing Kent or

having anything to do with her death, he admitted that he had encountered Ingram and Davis at the dump site and that he and Kent had done drugs and engaged in sexual activity while at the site. He further admitted to lying to detectives about the events that happened on August 9-10, and specifically lying about not knowing that Kent's body was in the trunk of the car.

1. Sherman argues that the evidence was insufficient to convict him because the evidence was entirely circumstantial, no one witnessed Kent's death, Sherman testified at trial about how he did not kill Kent and discovered her body in the trunk, and there were other facts presented to support an alternative theory of how the murder occurred. See OCGA § 24-4-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").[2]

However, § 24-4-6 does not apply because there was direct evidence of Sherman's guilt in the form of Sherman's statement to Brown that Sherman thought Kent took his pills and that after he killed her, he found the pills. See

_____

[2]This case was tried under Georgia's old Evidence Code. The new Evidence Code, which became effective January 1, 2013, renumbers § 24-4-6 as § 24-14-6.

5

Wallace v. State, 279 Ga. 26 (1) (608 SE2d 634) (2005) (where the defendant's own statement was direct evidence of his guilt, reliance on § 24-4-6 was misplaced). We find that the evidence in this case was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Sherman was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); see also Vega v. State, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'") (citation omitted).

2. Sherman argues that the trial court erred by failing to grant him a new trial due to his counsel's ineffective assistance. Sherman contends that his trial counsel failed to challenge the array, or in the alternative, move for a mistrial, following a prejudicial statement regarding Sherman's guilt made by one of the prospective jurors in the presence of other prospective jurors.

Prior to voir dire, the indictment was read to the jury panel. During individual voir dire and in the presence of other jurors, the following colloquy transpired between Juror #12 and the Assistant District Attorney:

Q: Any reason you can think of why you wouldn't make a good

juror in this case?

A: I've been wrestling with that question all morning long because you've been asking everybody here, and there is one thing that just bothers me, is the fact that when the officer went to arrest him, he ran. That kind of bothers me. I know there's evidence to be presented, but just in general if I'm somewhere and somebody's accusing me of something and I don't want to get caught, I'm going to run. You know as a kid when you were doing things you weren't supposed to be doing, what did you do? You went and hide [sic] underneath the bed or something like that because you knew you was [sic] guilty. I just, there's just an issue there in my head with this.

Q: Would that create any prejudice in your mind against the Defendant at this point, or would you be able to listen to the evidence, listen to the law as the Judge gives it to you and reach your verdict based solely on that?

A: I'd have to abide by the law so it would be something in there.

Q: Well, I don't think anybody is pro crime.

A: Right.

Q: So any allegation, a normal citizen would have a problem with it, correct?

A: Correct.

Q: You agree that it would be the best practice and jurors would be expected to base their verdict only on the evidence they hear in the courtroom. Do you understand that?

A: I understand that.

Q: And you would or would not be able to do that?

A: I would.

Sherman's trial counsel then approached the bench and informed the judge that she wanted to follow up with Juror #12 outside the presence of the remaining jurors, to which the judge agreed. Upon further questioning by defense counsel,

Juror #12 stated that the charges read from the indictment led him to assume that Sherman ran from the police at the time they tried to arrest him, he had already made a decision that Sherman was guilty of something because he ran, and he could not be a fair and impartial juror. Defense counsel then moved to strike Juror #12 for cause, to which the State did not object, and the court granted the motion.

To establish ineffective assistance of counsel, a defendant must show that his trial counsel's performance was professionally deficient and that but for such deficient performance there is a reasonable probability that the result of the trial would have been different. Strickland v. Washington, 466 U. S. 668, 695 (104 SCt 2052, 80 LE2d 674) (1984); Wesley v. State, 286 Ga. 355 (3) (689 SE2d 280) (2010). To prove deficient performance, one must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Romer v. State, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). Courts reviewing ineffectiveness claims must apply a strong presumption that counsel's conduct fell within the wide range of reasonable professional performance. Id. Thus, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim

8

only if they were so patently unreasonable that no competent attorney would have followed such a course. Id. If the defendant fails to satisfy either the "deficient performance" or the "prejudice" prong of the Strickland test, this Court is not required to examine the other. See Green v. State, 291 Ga. 579 (2) (731 SE2d 359) (2012).

At the motion for new trial hearing, Sherman's lead trial counsel explained that after Juror #12 made his remarks, she made the decision to question him further outside the presence of the jury. She explained also that she did not move for a mistrial because she did not believe that Juror #12's initial comments were so prejudicial that they would have tainted the other prospective jurors. We do not find that counsel's strategic decision to not move to challenge the poll or to empanel new jurors,[3] and instead proceed with questioning Juror #12 outside the presence of the jury, was so patently unreasonable that no competent attorney would have followed such a course.

Moreover, Sherman has failed to show a reasonable probability that but for

_____

[3]The State is correct that a motion for a mistrial would not have been the proper procedural tool for challenging prejudicial comments made during the voir dire of prospective jurors; the proper tool is a motion for a postponement to impanel other jurors or a challenge to the poll. See Sharpe v. State, 272 Ga. 684 (5) (531 SE2d 84) (2000).

trial counsel's alleged errors, the result of the proceeding would have been different. Juror #12's statements were not so inherently prejudicial such as to deny Sherman a fair trial because (1) the comments did not necessarily brand Sherman as a criminal who had committed the specific crimes at issue in this case; and (2) the comments did not link Sherman to any other criminal violations. See Sharpe v. State, 272 Ga. 684, 688 (5) (531 SE2d 84) (2000) (Where prospective juror's comments "neither necessarily implied Appellants' guilt of the offense under consideration, nor linked them to other criminal violations," the remarks were not inherently prejudicial and did not deprive the Appellants of their right to begin their trial with a jury "free from even a suspicion of prejudgment or fixed opinion.") (citation omitted). Cf. Moore v. State, 156 Ga. App. 92 (1) (274 SE2d 107) (1980) (juror's comment during voir dire that the defendant was a "firebug" was inherently prejudicial where the defendant was on trial for arson). Instead, the comments were in response to whether Juror #12 could be fair and impartial after hearing the charges against Sherman, and Juror #12 was struck for cause. Therefore, the trial court did not err in denying Sherman's amended motion for a new trial.

Judgment affirmed. All the Justices concur.

10