**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**August 24, 2020**

# In the Court of Appeals of Georgia

A20A0947. TUMLIN v. THE STATE.

RICKMAN, Judge.

Joseph Lee Tumlin was tried by a jury and convicted of aggravated child molestation and child molestation. On appeal, Tumlin contends, inter alia, that he received ineffective assistance of counsel because his trial counsel failed to subpoena favorable evidence and that the trial court erred in excluding evidence that he passed a polygraph examination. For the following reasons, we reverse.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(Citation and punctuation omitted.) *Johnson v. State*, 340 Ga. App. 429, 430 (797 SE2d 666) (2017).

So viewed, the evidence showed that Tumlin resided with his wife and their two young daughters, the victim and A. T. One day when the victim was four, she was using the restroom and told her mother that she had something to tell her. While crying, the victim told her mother that "daddy made me suck his bottom," referring to his penis. The victim's mother testified that the victim elaborated and stated that when she sucked her daddy's bottom, white stuff came out.

The victim's mother called the victim's maternal grandmother, and the grandmother came to their house and they begin to pack up their belongings. Also, at some point that day, the victim's mother withdrew $12,000 from her joint checking account with Tumlin. The grandmother, the victim's mother, the victim, and A. T. all went back to the grandmother's home. The victim's mother and grandmother called law enforcement and a detective arrived.

After the detective talked to the victim's mother, the victim wanted to talk to the detective. The detective testified that the victim was "very aggressive" about

2

wanting to speak with her, the victim told the detective that Tumlin made her suck his private and that white stuff came out.

Tumlin and the victim's step-grandfather were at work on the date and time the victim made her allegations. When they arrived back at the grandmother's house after work, the victim's mother confronted Tumlin about the allegations. The victim's mother and her grandmother testified that Tumlin stated "[i]f I did, it, I don't remember doing it."

A forensic interviewer conducted a recorded forensic interview of the victim that was published to the jury. The forensic interviewer testified that the victim revealed to her that Tumlin touched her with his bottom, referring to Tumlin's penis. The victim also repeated to her the same allegation that she made to her mother and grandmother about sucking Tumlin's bottom. The victim's therapist testified that the victim repeated the same allegations to her and that the victim suffered from nightmares as result of the abuse.

At trial, the victim testified that she was five years old and that she did not remember who her dad was, she did not remember why she stopped seeing Tumlin, and she did not remember ever talking to anyone about anything Tumlin might have done.

A grand jury returned an indictment charging Tumlin with aggravated child molestation and child molestation. Tumlin was convicted of both charges. Tumlin filed a timely motion for new trial, which the trial court denied. This appeal follows.

1. Tumlin contends that he received ineffective assistance of counsel because of his trial counsel's failure to subpoena favorable evidence.

To prevail on an ineffective assistance of counsel claim, Tumlin must prove both that his trial counsel's performance was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish prejudice, Tumlin must show that "but for such deficient performance there is a reasonable probability that the result of the trial would have been different." *Sherman v. State*, 295 Ga. 339, 342 (2) (759 SE2d 832) (2014). "In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo." (Citation omitted.) *Washington v. State*, 276 Ga. 655, 658 (3) (581 SE2d 518) (2003).

Tumlin testified that shortly before the victim made the allegations he came home from work and noticed the victim's mother and the victim watching a television

4

talk show called "Dr. Phil," hosted by a psychologist. The episode was titled, "Forgiving the Unforgivable" and the subject matter was child molestation. Tumlin asked the victim's mother if she realized the victim was sitting with her watching this show and she replied negatively. The victim's mother asked the victim to leave the room and Tumlin testified that he told her that he could not believe she was allowing the victim to watch the show due to its graphic nature. The following colloquy occurred between Tumlin and his trial counsel on direct examination:

> Trial Counsel: Mr. Tumlin, it's awfully convenient it seems, somebody could argue, that you . . . and [the victim's mother] had a misunderstanding or a disagreement about [the victim] seeing a show about child molestation. You realize that you're under oath right now?
>
> Tumlin: Yes, sir.
>
> Trial Counsel: You realize that testimony under oath that is false is perjury and it's a felony?
>
> Tumlin: Yes, sir.
>
> Trial Counsel: And you're trying to tell this jury that you were concerned enough about child molestation to . . . worry about [the victim's] viewing habits before these accusations arose?

Tumlin: Yes, sir.

Trial Counsel: What happened with [the victim's mother] as a result of you finding [the victim] watching Dr. Phil about child molestation?

Tumlin: She seemed like she got a little upset because she always watches Dr. Phil every day.

Trial Counsel: You say she seemed like she got upset. What did she do?

Tumlin: She started fussing with me a little bit.

On cross-examination, Tumlin stated that the Dr. Phil episode aired on Tuesday and Wednesday on the week the victim made the allegations. The State asked Tumlin, "[d]o you have any explanation as to why that show didn't even air in the Atlanta area on Tuesday?" Tumlin replied, "To my knowledge, I remembered it being on two days that week." The State called the victim's mother in rebuttal and she testified that she did not remember ever watching a Dr. Phil show and in particular did not remember a Dr. Phil show titled, "Forgiving the Unforgivable." On cross-examination, the victim's mother changed her testimony, stating that she "may have s[een] four or five episodes" of Dr. Phil.

At Tumlin's motion for new trial hearing, Tumlin's trial counsel testified that the video would have been "great" to have, but she did not think she had the "manpower" to be able to obtain it. Trial counsel testified that the video "was very important to me and to my client." Despite the video's importance, however, trial counsel testified that she never filed a subpoena duces tecum against the television studio to obtain a copy of the video.

At the hearing, an investigator with the Paulding County public defender's office testified that he was able to subpoena a copy of the Dr. Phil episode titled "Forgiving the Unforgivable" and a copy was introduced into evidence. We have reviewed this episode and the subject matter is regarding two daughters who attempt to get their mother to acknowledge her role in the sexual abuse they suffered at the hands of her husband, the girls' stepfather. One of the daughters made an outcry about the abuse and the step-father was eventually jailed as a result. The parties agree that it appears that the episode in question may have been aired on May 11, 2011, two days prior to the victim's outcry to her mother. The weather alerts aired during the episode also indicate that the episode aired on Wednesday, March 11th.

Regardless of when the episode aired, however, trial counsel stated that an argument could be made that the timing of his disagreement with his wife about

7

allowing the victim to watch the episode was "awfully convenient," and counsel disputed the existence of the episode when Tumlin was on direct examination. That suggestion was capitalized on by the State in its cross-examination of Tumlin and the rebuttal evidence presented through the victim's mother.

"[This] case was a pure credibility contest between [the victim] and [Tumlin]. And in such cases, defense counsel's failure to introduce available evidence that corroborates a defendant's testimony supports a finding that counsel's performance was deficient." *State v. Crapp*, 317 Ga. App. 744, 748 (2) (732 SE2d 806) (2012). See *Gibson v. State*, 280 Ga. App. 435, 437 (1) (634 SE2d 204) (2006) (holding that the defendant's trial attorneys rendered deficient performance when they failed to obtain evidence that could have discredited the State's witnesses).

"In close cases, where the evidence presented by the state is thin, mistakes made by trial counsel take on greater significance." (Citation and punctuation omitted.) *Crapp*, 317 Ga. App. at 748 (2). At trial, the victim did not have any recollection of who her father was, let alone the allegations which led to his arrest. While the State did introduce the child's forensic interview and testimony from her therapist, it's case rested in large part on the testimony of the victim's mother, the initial outcry witness. Even more concerning, by his inartful questioning, Tumlin's

8

trial counsel essentially called into question the existence of the only evidence that could have corroborated his explanation of events. A reasonable probability exists that this evidence could have impeached the mother's credibility and corroborated Tumlin's testimony and its introduction would have affected the result of the trial. See *State v. Walker*, 327 Ga. App. 304, 308 (758 SE2d 836) (2014); *Crapp*, 317 Ga. App. at 748 (2). Accordingly, the trial court erred by finding that Tumlin did not receive ineffective assistance of counsel and we reverse Tumlin's convictions.[1]

2. Tumlin contends that the trial court erred in excluding evidence that he passed a polygraph.

We address this enumeration because it is likely to occur at retrial. Tumlin took and passed an unstipulated polygraph and the trial court excluded the results because of the lack of stipulation.

"It has been stated and reiterated that under the law as it now exists in this State, results of polygraph tests are admissible only upon the *express* stipulation of the parties." (Citation and punctuation omitted; emphasis in original.) *McGraw v.*

---

[1] We note that "because the evidence of [Tumlin's] guilt was otherwise sufficient, the State is authorized to retry [him] without violating the constitutional bar against Double Jeopardy." *McMullen v. State*, 316 Ga. App. 684, 684 (730 SE2d 151) (2012).

9

*State*, 199 Ga. App. 389, 393 (10) (405 SE2d 53) (1991). "Neither the legislature nor the Supreme Court has provided for admission under the theory of a stipulation implied by the circumstance of favorable evidence for the accused." Id. Accordingly, the trial court did not err by failing to admit the results of Tumlin's polygraph. See *McIntyre v. State*, 207 Ga. App. 129, 130 (2) (427 SE2d 99) (1993); *McGraw*, 199 Ga. App. at 393 (10).[2]

*Judgment reversed. Dillard, P. J., and Brown, J., concur*.

---

[2] "[B]ecause [Tumlin's] remaining enumerations of error relate to issues that are not likely to recur in the event of a retrial, we do not address them at this time." *Beck v. State*, 305 Ga. 383, 388 (2) (825 SE2d 184) (2019).